PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-3510

_____

JOSEPH WATSON,

Appellant

v.

GERALD L. ROZUM, SUPERINTENDENT; DANIEL
GEHLMANN, DEPUTY SUPT.; JOSEPH DUPONT,
HEARING OFFICER AT SCI SOMERSET; LEO GLASS,
MAJOR AT SCI SOMERSET;  MELISSA HAINSWORTH,
MAJOR AT SCI SOMERSET; SIMOSKO, SECURITY
CAPTAIN AT SCI SOMERSET; SNYDER, SECURITY
CAPTAIN AT SCI SOMERSET; COUTTS, SECURITY
OFFICER AT SCI SOMERSET

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 3-12-cv-00035)
District Judge: Honorable Kim R. Gibson

_____

Argued October 8, 2015

Before: McKEE, Chief Judge, AMBRO, and HARDIMAN,
Circuit Judges

(Opinion filed:  August 23, 2016)

Kathleen G. Kane
   Attorney General of Pennsylvania
Kemal A. Mericli    **(Argued)**
Office of Attorney General of Pennsylvania
564 Forbes Avenue

6th Floor, Manor Complex
Pittsburgh, PA 15219

      Counsel for Appellees

Benjamin R. Barnett
Ellen L. Mossman **(Argued)**
Dechert, LLP
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

      Counsel for Appellant

_____

OPINION OF THE COURT
_____

McKee, <u>Chief Judge</u>

Joseph Watson, an inmate at the State Correctional Institution at Somerset, Pennsylvania, filed this action under 42 U.S.C. § 1983 alleging prison officials violated his First Amendment rights by improperly issuing a misconduct against him, and by retaliating against him for the exercise of his First Amendment rights.

The District Court dismissed Watson's suit against some of the officials with prejudice, and granted summary judgment in favor of the remaining officials on Watson's surviving retaliation claims. Watson then filed this appeal. For the following reasons, we will affirm in part, reverse in part, and remand for further proceedings on Watson's retaliation claim against Officer Coutts.

**I.**

Watson's claims arise from the alleged mishandling and confiscation of his radio during a routine cell search conducted by Officer Kline at 8:30 A.M. on December 6, 2011. According to Watson, while inspecting Watson's radio, Kline pulled the antenna out so far that it broke off. Kline claims a portion of the antenna was already broken and had

2

been secured with tape. Watson asserted that the antenna was merely loose and not broken, but agreed that it was secured with tape when Kline examined it. Watson accused Kline of breaking the radio and insisted that Kline have it repaired. According to Watson, he consented when Kline explained that a broken radio is considered contraband that had to be confiscated.[1] Watson accompanied Kline to the officer's desk on the cellblock to fill out the paperwork required when an inmate's property is confiscated.

In completing that paperwork, Kline noted that the antenna was already broken when he found it. Watson claimed Kline actually broke the radio and was not pleased that Kline did not take responsibility. Watson asked Kline to prepare an incident report documenting that Kline broke the antenna. Kline refused. Watson then asked Captain Simosko for a grievance form, but Simosko refused to give him one.

Later that day Watson was summoned to the prison security office where Officer Coutts purportedly asked Watson about the broken radio. During this exchange, Coutts purportedly stated that Watson had given Simosko and Kline a "hard time" by asking for a grievance form and insisting that the radio be repaired rather than just dropping the matter. Coutts allegedly told Watson that, as a result, he was going to give Watson a misconduct. According to Watson, Coutts said that he (Watson) had not handled the situation "the polite way" because he had insisted on filing a grievance.

Watson did eventually fill out a grievance form that he obtained from another prisoner. However, before Watson could file his grievance, he was summoned to pick up a misconduct notice that had been prepared by Coutts and approved and signed by Security Captain Snyder. The misconduct notice cited Watson with a Class I misconduct and stated that the radio had been confiscated as contraband. The misconduct form indicated that it was received at 2:23 P.M., nearly six hours after the search of Watson's cell. After

---

[1] Department of Corrections Policy, DC-ADM 815, Section 3.C.1. A broken radio, altered from its original state, is considered contraband pursuant to DOC rules and regulations.

3

receiving the misconduct, Watson filed his grievance against Kline. Watson did not file a grievance against anyone else who had been involved with the confiscation of his radio or the misconduct that was filed against him.

Watson was ultimately found guilty of the charged misconduct at a hearing conducted by Hearing Officer Dupont. However, Dupont reduced the level of the misconduct from Class I to Class II. The penalty that was imposed was confiscation of Watson's radio. Watson's appeal of the imposition of a Class II misconduct was denied by the Department of Corrections' Program Review Committee. The Committee concluded that Dupont's decision was supported by the evidence at the hearing. Watson appealed that decision to the prison superintendent who sustained the prior decisions.

Thereafter, Watson filed the present lawsuit. The defendants were Gerald Rozum, Daniel Gehlman, Leo Glass, Melissa Hainsworth, Coutts, Dupont, Synder, and Simosko. The District Court dismissed all of Watson's claims with prejudice, with the exception of Watson's retaliation claims against Dupont, Simosko, Snyder and Coutts.

Thereafter, the District Court adopted the Magistrate Judge's recommendations and granted summary judgment in favor of each of the remaining defendants and against Watson. The District Court agreed that summary judgment was appropriate even if the record established that Watson had made out a *prima facie* case of retaliation, because prison officials would have issued the misconduct regardless of Watson's protected activity (the "same decision" defense). This appeal followed.

## II.

We exercise plenary review over a District Court's grant of summary judgment.[2] Summary judgment is appropriate if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as

---

[2] *Sutton v. Rasheed,* 323 F.3d 236, 248 (3d Cir. 2003).

4

a matter of law.[3] The judge's function at the summary judgment stage is solely to determine whether there is a genuine issue of material fact for trial.[4]

Watson alleged due process violations, an unconstitutional search and seizure under the Fourth Amendment and Fifth Amendment, prison policy violations, state law violations and retaliation for engaging in conduct protected by the First Amendment. As noted, all of Watson's initial claims were dismissed with prejudice, except for his claim for relief based on the alleged retaliation. Watson now appeals the District Court's grant of summary judgment on the retaliation claims. Therefore, we need only decide if Watson's retaliation claims survive summary judgment.

Our analysis is guided by our decision in *Rauser v. Horn*.[5] In order to establish illegal retaliation for engaging in protected conduct, Watson must prove that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials;[6] and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him.[7] Because motivation is almost never subject to proof by direct evidence, Watson must rely on circumstantial evidence to prove a retaliatory motive. He can satisfy his burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link.[8]

However, even if Watson establishes a *prima facie* case, prison officials may still prevail if they establish that

---

[3] *Carter v. McGrady*, 292 F.3d 152, 157 n.2 (3d Cir. 2002).

[4] *Id.*

[5] 241 F.3d 330 (3d Cir. 2001).

[6] An adverse action is one "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *See Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (internal quotation marks omitted).

[7] *Rauser*, 241 F.3d at 333-34.

[8] *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

"they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."[9] This is often referred to as the "same decision defense." For purposes of this appeal, the named prison officials assume that Watson engaged in constitutionally protected conduct and that he suffered an adverse consequence. They argue that Watson cannot establish the required causal nexus between the two and that, even if he could, the same decision defense applies. However, since we conclude that the evidence was sufficient to survive summary judgment as to Coutts, we will explain why we believe Watson satisfied the first two prongs of his *prima facie* case rather than merely relying on the defendants' assumption that he has.

*A. Whether Watson's Conduct was Constitutionally Protected*

Watson claims that he engaged in constitutionally protected activity when he filed a grievance against a corrections officer, and that defendants illegally retaliated by citing him for misconduct. In *Mitchell v. Horn*, we explained that filing such a grievance does "implicate[] conduct protected by the First Amendment."[10] Here, the allegedly retaliatory conduct occurred *before* he filed his grievance. However, we do not believe that chronology necessarily defeats Watson's retaliation claim because he informed prison officials of his intent to file a grievance and requested an appropriate form from Simosko before any misconduct was filed against him. For purposes of Watson's retaliation claim, we cannot discern a substantive distinction between retaliation for informing prison officials of an intent to file a grievance or requesting the necessary forms to do so on the one hand, and actually filing such a grievance on the other. Accordingly, the record is sufficient to establish the first prong of Watson's *prima facie* case of retaliation.

*B. Whether Watson Suffered an Adverse Action at the Hands of Prison Officials*

An adverse consequence "need not be great in order to be actionable[;]" rather, it need only be "more than *de*

---

[9] *Rauser*, 241 F.3d at 334.

[10] 318 F.3d 523, 530 (3d Cir. 2003).

*minimis*."[11] Watson clearly suffered an adverse consequence when Coutts charged him with a Class I misconduct. Class I misconducts subject inmates to a range of sanctions, including a disadvantageous change in housing assignment, placement in restricted housing or restrictive confinement for up to 90 days, or a detrimental change in program level.[12] They may also result in loss of the ability to participate in prerelease programs, including work release and temporary home furloughs for nine months.[13] These are clearly more than *de minimis* consequences. Moreover, even though his Class I misconduct was reduced to a Class II misconduct at his hearing, Watson lost his radio as a result and the Class II misconduct became part of his prison record. This is substantially more than a *de minimis* consequence for someone confined in a prison cell.

*C. Whether Watson's Constitutionally Protected Conduct was a Substantial or Motivating Factor in the Decision to Discipline Him*

We now arrive at the main contention in this dispute – whether the deprivation that Watson suffered was the result of his protected activity as required to establish the third prong of his *prima facie* case for illegal retaliation. We agree with the District Court's conclusion that Watson failed on this prong and that summary judgment was appropriate for Dupont, Simosko and Snyder.

There is no evidence of improper motivation or involvement in the issuance of the misconduct on the part of Simosko. As for Snyder and Dupont, Watson attempted to connect the confiscation of his radio to lawsuits he previously filed against those two. According to Watson, Snyder approved the misconduct, and Dupont upheld it, in retaliation for a lawsuit that he filed against Snyder in 2008 and for a separate lawsuit against Dupont in 2009. Watson has conceded, however, that Dupont did not retaliate against him regarding the grievance, and that his claim was based solely

---

[11] *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotations omitted).
[12] 37 Pa. Code § 93.10.
[13] *Id*. § 94.3(a)(4).

on a prior lawsuit against Dupont. Indeed, the timing between the prior suit against Dupont in 2009 and the confiscation of Watson's radio two years later is just too remote to suggest a retaliatory motive here. Likewise, the timing for Snyder is even weaker, as he would have approved the misconduct charge despite the previous lawsuit Watson filed in 2008. Nothing here suggests that those lawsuits had any connection whatsoever to the fact that Watson's radio was deemed to be contraband.

However, Coutts is in a different situation. As we shall explain, the record supports conflicting inferences regarding Coutts' motive in issuing Watson's misconduct. Accordingly, disputed issues of fact surround the retaliation claim against Coutts. Summary judgment in favor of him was not appropriate.

As we noted earlier, Watson can establish the third element of a *prima facie* case of retaliation with evidence of: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.[14] However, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."[15] Moreover, causation, like any other fact, can be established from the evidence gleaned from the record as a whole.[16] "[W]here the temporal

---

[14] *Lauren W.,* 480 F.3d at 267; *Rauser,* 241 F.3d at 334 (concluding that "Rauser has demonstrated a suggestive temporal proximity between his insistence on his First Amendment rights and his [prison] transfer and wage reduction.").

[15] *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003) (internal quotation marks omitted) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)).

[16] *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (concluding "that the District Court employed too restrictive a view of the type of evidence that can be considered probative of the causal link. It is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned

proximity is not so close as to be 'unduly suggestive,'" the appropriate test is "timing plus other evidence."[17] Here, Coutts' statements to Watson satisfy any requirement for "other evidence."

In reviewing a grant of summary judgment, we "view the evidence and all justifiable inferences to be drawn therefrom in the light most favorable to the non-moving party."[18] We must determine if the record, viewed in this light, contains a genuine dispute of material fact as to whether Watson was punished for engaging in protected conduct apart from the legitimate misconduct Coutts charged him with.

Watson argues that the proximity between his constitutionally protected action and the challenged adverse action is sufficient to establish causation.[19] According to Watson, only a few hours elapsed between his request for a grievance form and the issuance of the misconduct. The confiscated items receipt was filled out at 8:40 A.M., soon after Kline searched Watson's cell and discovered Watson's radio. However, the misconduct was not issued until 2:23 P.M. that same day; nearly six hours after his radio was seized and only after Watson had declared that he was going to file a grievance.

Before Coutts issued the misconduct, he purportedly told Watson that he was being written up for giving Kline and Simosko a "hard time" and for not being "polite." Here Coutts never elaborated on what he meant by saying Watson gave the officers a "hard time" or was not being "polite," and inferences must be drawn in favor of Watson, as the nonmoving party. Accordingly, Watson has established a *prima facie* case against Coutts, because there is a genuine issue of material fact as to whether Watson's decision to file a

---

from the record as a whole from which causation can be inferred.").

[17] *Id.* at 280.

[18] *Rauser,* 241 F.3d at 334.

[19] *Id.* (concluding that "Rauser has demonstrated a suggestive temporal proximity between his insistence on his First Amendment rights and his transfer and wage reduction.") (internal citation omitted).

grievance motivated Coutts to charge him with misconduct. Since he has established a *prima facie* case, we then look to whether Coutts satisfies the same decision defense.

### III.

We begin our discussion of whether Coutts was entitled to judgment as a matter of law with our decision in *Carter v. McGrady*.[20] There, an inmate claimed that he was given a misconduct because prison officials resented his functioning as a jailhouse lawyer. In rejecting that claim, we noted that most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence. We explained that "[e]ven if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses, such as receiving stolen property, were so clear and overt that we cannot say that the disciplinary action taken against Carter was retaliatory."[21] Accordingly, we "[could] not say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the 'broad discretion' that we must afford them."[22] In reaching that conclusion, we emphasized the "great deference" that the decisions of prison administrators are entitled to in the context of disciplinary proceedings.[23]

Not all Circuit Courts of Appeals agree on this standard. The Courts of Appeals for the Second, Eighth and Eleventh Circuits have formulated a same decision defense based on some evidence of prisoner misconduct,[24] which

---

[20] 292 F.3d 152 (3d Cir. 2002).

[21] *Carter,* 292 F.3d at 159.

[22] *Id.* (citing *Thornburgh v. Abbott*, 490 U.S. 401, 403 (1989) (quotations in original).

[23] *Id.* at 158.

[24] *See, e.g., Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) ("The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.'") (citation omitted); *Hartsfield v. Nichols,* 511 F.3d 826, 829

originates from the Supreme Court decision in *Superintendent, Mass. Corr. Inst., Walpole v. Hill.*[25] There, the Court held that prison disciplinary convictions may be upheld if they are supported by "some evidence" of misconduct. The Courts of Appeals for the Fifth and Seventh Circuits, however, have found that some evidence is not an absolute bar and permit claims by prisoners to go to trial if the prisoner can offer evidence that contradicts prison officials' explanations for their action against the inmate.[26]

(8th Cir.2008) (reviewing allegations of false disciplinary reports and concluding "claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule.")(citation omitted); *Orebaugh v. Caspari,* 910 F.2d 526, 528 (8th Cir.1990) (noting that "[N]o claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform."); *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994) (holding if there is "some evidence" that a prisoner committed the alleged misconduct, that "essentially checkmates his retaliation claim."); *O'Bryant v. Finch,* 637 F.3d 1207, 1217 (11th Cir. 2011)(noting that "if the [prison] official can show that he would have taken the disciplinary action in the absence of the prisoner's protected conduct, he cannot be held liable.").

[25] 472 U.S. 445, 447 (1985) (concluding "that where good time credits constitute a protected liberty interest, a decision to revoke such credits must be supported by some evidence.").

[26] *Woods v. Smith,* 60 F.3d 1161, 1164–65 (5th Cir.1995) (noting that a retaliation claim focuses not on the merits of the disciplinary proceeding but on the retaliatory "interference, asking only whether there has been an obstruction of the exercise of a constitutional right."). The "concern is whether there was retaliation for the exercise of a constitutional right, separate and apart from the apparent validity of the underlying disciplinary" conviction. *Id.*; *Greene v. Doruff,* 660 F.3d 975, 977–80 (7th Cir.2011) (adopting but-for causation with burden-shifting mechanism, and noting that once prisoner shows that the violation was a motivating factor, "the burden shifts to the defendant to show that the harm would have occurred anyway."). Although a state appellate court decision, the Indiana Court of Appeals

However, in *Rauser,* we held that the defendant must establish that the same decision would have been made even absent any retaliatory motive.[27]

As noted, in *Carter* we explained that we evaluate the "the quantum of evidence" of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion we must afford them.[28] Given the force of the evidence that Carter was guilty of receiving stolen property, we held that the there was no genuine issue of material fact that his misconduct citation was reasonably related to legitimate penological interests, and that Carter would have been disciplined notwithstanding his jailhouse lawyering.[29]

Watson's situation is different. Watson's broken radio was not so "clear and overt" a violation that we can conclude that he would have been written up if he had not also given prison officials "a hard time." The radio had allegedly been in the same condition for more than a year. Moreover, there is evidence that other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct. Finally, Kline did not charge Watson with a misconduct when he confiscated the radio. Accordingly, a reasonable fact finder could conclude that the misconduct was issued in retaliation for Watson's statement that he was going to file a grievance, and not in furtherance of legitimate penological goals.

We note that this is not the first time that we have held that a plaintiff can make out a retaliation claim even though

provides an example of a more flexible approach. *See Medley v. Lemmon,* 994 N.E.2d 1177, 1190 (Ind. Ct. App. 2013)(noting that it is not clear whether a "retaliation claim should automatically be defeated in such a situation, especially where the decision of what punishment to impose on a prisoner for a rules infraction is entirely discretionary.").

[27] *Rauser,* 241 F.3d at 334 n.2 (citing *Goff v. Burton,* 7 F.3d 734, 737 (8th Cir.1993) as an example of a Circuit that takes an opposing approach to ours).

[28] *Carter*, 292 F.3d at 159.

[29] *Id.*

the charge against him may have been factually supported.[30] In *Hill v. City of Scranton*, four police officers survived summary judgment on their claims that the city had retaliated against them by selectively enforcing an ordinance to punish them for a lawsuit that they had brought even though it was clear that three officers violated the relevant ordinance.[31] We reasoned that it was not necessary for the officers to allege or prove compliance with the ordinance to prevail on their First Amendment claim.[32]

## IV.

For the reasons set forth above, we will affirm the District Court's grant of summary judgment on Watson's retaliatory claims against Dupont, Simosko and Snyder, but reverse the grant of summary judgment in favor of Coutts and remand for further proceedings on that claim.

---

[30] 411 F.3d 118, 130 (3d. Cir. 2005).

[31] *Id.*

[32] *Id*. (noting that "The officers certainly do not need to allege or prove compliance with the ordinance to prevail on their First Amendment claim. Discriminatory enforcement of a statute or ordinance is not justified simply because the enforcement is otherwise valid.").

Joseph Watson v. Gerald Rozum et al.
No. 13-3510

_____

AMBRO, Circuit Judge, concurring

Imagine a guard tells an inmate accused of misconduct that he never would have been charged if he had not filed a complaint against prison officials. The inmate admits to the misconduct but argues that the retaliatory enforcement is nonetheless unlawful. Can the guard, having conceded that the outcome would have been different without the complaint, still take advantage of something we call the "same decision" defense? If we are to give any meaning to the name of the defense, the answer must be "no."

However, some panels of our Court have come out differently in non-precedential opinions, leading to confusion in the district courts about the state of our law. Those outcomes, though incorrect in my view, draw support from decisions in some of our sister circuits. Thus, in addition to joining Chief Judge McKee's excellent opinion, which fully resolves our case, I write separately to discuss the application of the same decision defense in future lawsuits.

In our Court, the confusion starts with our decision in *Carter v. McGrady*, 292 F.3d 152 (3d Cir. 2002). That case involved a prisoner who was disciplined for "egregious violations of prison policy," including receiving a stolen typewriter and sending unauthorized letters. *Id.* at 154. He argued that the reason for the disciplinary charges was that prison officials resented him for working as a jailhouse lawyer. However, there was overwhelming evidence of his guilt and nothing concrete to suggest that he was being charged only because he helped other inmates with their legal matters. We therefore concluded that, even if he could

establish a *prima facie* First Amendment retaliation case, the same decision defense applied. We wrote:

> Given the quantum of evidence of Carter's misconduct, we cannot say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the broad discretion that we must afford them. Even if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses, such as receiving stolen property, were so clear and overt that we cannot say that the disciplinary action taken against Carter was retaliatory.

*Id.* at 159 (internal quotation marks and citation omitted).

This passage raised two questions. First, what "quantum" of evidence is required to trigger *Carter*? And in cases where that "quantum" has been reached, can the same decision defense nonetheless fail? Until today's decision we had never addressed either question in a precedential opinion. However, a series of non-precedential opinions from panels of our Court suggested that the answer to the first question is merely "some evidence" and that the answer to the second is "no." *See, e.g.*, *Bullock v. Buck*, 611 F. App'x 744, 748 (3d Cir. 2015); *Dockery v. Beard*, 509 F. App'x 107, 111 (3d Cir. 2013). Under Internal Operating Procedure 5.7, these non-precedential opinions do not speak for the full Court or constitute binding precedent. However, our district courts have applied these answers in more than 80 cases, and the time has come for us to clarify.

So from where, if not *Carter*, do these answers come? As it turns out, our district courts and our non-precedential opinions have borrowed them from the Eighth Circuit. In

2

*Orebaugh v. Caspari*, 910 F.2d 526 (8th Cir. 1990), that Court held that, "[w]hile a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform." *Id.* at 528. It reasoned that a contrary holding "would allow a prisoner to openly flout prison rules after filing a grievance and then bring a claim under section 1983 arguing that prison officials disciplined him in retaliation for his filing a grievance." *Id.* Thus, it gave a "no" answer to our second question—whether a prisoner can ever succeed in a retaliation lawsuit when there is sufficient evidence that he was disciplined for misconduct he actually committed. As for the first question—the amount of proof required—the Court implied that the standard is "some evidence" supporting the misconduct charge. *Id.*

Next, in *Henderson v. Baird*, 29 F.3d 464 (8th Cir. 1994), the Court expressly adopted the "some evidence" standard. Specifically, it held that a "finding [of misconduct that] was based on some evidence of the violation . . . essentially checkmates [a] retaliation claim." *Id.* at 469. Lest anyone draw too much encouragement from the word "essentially," the Court later restated its test without that qualifier. *See Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008) ("[C]laims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule. Thus, a defendant may successfully defend a retaliatory discipline claim by showing *some evidence* the inmate actually committed a rule violation.") (emphasis added) (internal quotation marks and citation omitted).

Our district courts and our non-precedential opinions have treated these Eighth Circuit cases as a way to give meaning to *Carter*'s standards. This is a problem for two

3

reasons. First, *Carter* never said that "some evidence" is a sufficient "quantum" or that it is impossible for a prisoner to succeed in a retaliation case when there is enough evidence of misconduct. And second, I believe that the Eighth Circuit's cases were wrongly decided and that, even if that were not so, our precedent prevents us from importing them into our law.

Judge Heaney's partial dissent in *Orebaugh* persuasively explains the problems with the Eighth Circuit's reasoning. He wrote that "no court has heretofore articulated . . . a rule" that "the legitimate reasons the prison officials have advanced"—*i.e.*, that the prisoner actually engaged in misconduct—"are dispositive of [a] retaliation claim." 910 F.2d at 529–30 (Heaney, J., concurring in part and dissenting in part). He said that a prisoner instead "deserves the opportunity to try to show that the reasons given for disciplining him were a pretext for the prison officials' retaliatory animus." *Id.* He concluded by observing:

> In its zeal to stem the tide of prisoner litigation and in a misguided attempt to discourage the open flouting of prison rules, the majority . . . denies Orebaugh . . . equal access to the adversarial process . . . and deprives this court of the opportunity to review Orebaugh's retaliation claim on an adequately developed record. In so doing, the majority immunizes from review any trivial disciplinary charge that prison officials can support with some evidence, allowing such officials to inhibit prisoners' constitutional right of access to grievance procedures with impunity.

*Id.* at 530.

4

The Fifth Circuit has agreed with Judge Heaney. It noted that the Eighth Circuit's approach might make sense for malicious prosecution claims, which require plaintiffs to show that the charges against them were legally "groundless." *Woods v. Smith*, 60 F.3d 1161, 1164–65 (5th Cir. 1995). A "retaliation claim, on the other hand, focuses on . . . interference, asking only whether there has been an obstruction of the exercise of a constitutional right." *Id.* at 1165. It therefore held that an "action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate." *Id.* Any other ruling "would unfairly tempt corrections officers to enrobe themselves and their colleagues in what would be an absolute shield against retaliation claims." *Id.*

Meanwhile, other than concerns over an onslaught of lawsuits, the Eighth Circuit has given very little justification for its approach. The closest we get is a citation in *Henderson* to the Supreme Court's decision in *Superintendent v. Hill*, 472 U.S. 445 (1985). That decision does use the term "some evidence," but in a different context. The Supreme Court addressed a claim that officials violated a prisoner's Fifth Amendment due process rights by arbitrarily taking away his good time credits, which would have lowered his sentence based on good behavior. The Court ruled that the Constitution requires, at a minimum, that prison disciplinary decisions be supported by "some evidence" before officials can interfere with an inmate's protected liberty interests. *Id.* at 447.

Nothing in *Hill* requires, or even suggests, its use in First Amendment retaliation cases, and the Eighth Circuit has not explained why it has applied that standard. *Hill* says that a disciplinary proceeding will not be constitutionally infirm if there is "some evidence." But officials cannot cleanse a First Amendment violation merely by complying with the Fifth

5

Amendment. Due process requires that a prisoner have a fair opportunity to show that he did not commit the misconduct. The First Amendment provides that, even if he did commit it, he has a right to be free from enforcement that would not have occurred if he had not filed a complaint. *See, e.g.*, *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("The issue in *Hill* was merely whether there was, and whether there needed to be, some evidence to support a prison disciplinary decision. The issue here is whether the disciplinary decision was improperly motivated.").

There is another reason not to apply the Eighth Circuit's test in our cases. In that Circuit a plaintiff has the burden to disprove the same decision defense. *See Goff v. Burton*, 7 F.3d 734, 737 (8th Cir. 1993). The Eighth Circuit has acknowledged that, in the employment retaliation context, the Supreme Court has put the burden of establishing the defense on the defendant. *See id.* at 737–38 (citing *Mount Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977)). However, it has declined to use the *Mount Healthy* test in prisoner retaliation cases. *Id.*

By contrast, we have rejected *Goff* and, per *Mount Healthy*, placed the burden in prisoner retaliation cases on the defendant to establish the same decision defense. *See Rauser v. Horn*, 241 F.3d 330, 333 & n.2 (3d Cir. 2001) (adopting *Mount Healthy* and disagreeing with *Goff*). Our use of *Mount Healthy* is significant. That is because, as Chief Judge McKee notes in our panel's majority opinion, we already have held that the same decision defense from *Mount Healthy* does not automatically bar liability when a plaintiff is charged, based on retaliatory motivations, for misconduct that he actually committed.

For instance, in *Hill v. City of Scranton*, 411 F.3d 118 (3d Cir. 2005), police officers were fired for violating an

6

ordinance. It was clear that they did not comply with the ordinance, but they argued that the City would not have enforced it had they not engaged in constitutionally protected activity. We held that under *Mounty Healthy* the officers did not need to show "compliance with the ordinance to prevail on their First Amendment claim" because "[d]iscriminatory enforcement of a statute or ordinance is not justified simply because the enforcement is otherwise valid." *Id.* at 130. The same should be true here.[1]

---

[1] The Eleventh Circuit has adopted the Eighth Circuit's approach. *See O'Bryant v. Finch*, 637 F.3d 1207, 1215 (11th Cir. 2011). Thus, my criticisms of the latter's test apply with equal force to the former's. Meanwhile, the Second Circuit has reached a similar result, albeit by different reasoning. *See Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) ("The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.'") (internal citation omitted) (quoting *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998)). *Hynes*, in turn, relies on a "presumption that a prison official's acts to maintain order are done for a proper purpose." 143 F.3d at 657 (internal quotation marks omitted). The problem is that the Court never explains why this presumption cannot be rebutted. Surely there are circumstances where evidence can show that an official was not acting for a proper purpose. But this test closes the door to such proof. I note, however, that the Second Circuit's approach, though one I disagree with, at least requires that there be "no dispute" as opposed to merely "some evidence."

Today's decision takes an important step toward clarifying that *Carter* does not incorporate the Eighth Circuit's approach. In particular, there is undoubtedly "some evidence" that Joseph Watson's prison radio was contraband. But we correctly hold that this is not the type of "clear and overt" misconduct that satisfies *Carter*'s "quantum of evidence" standard. *See Carter*, 292 F.3d at 159.

Indeed, this case provides an example of why Judge Heaney and the Fifth Circuit in my view are correct. Watson's radio was normal in all respects but one—it had a small piece of tape securing the antenna. Prison regulations define contraband to include "any item altered from its original state." *See* Department of Corrections Policy, DC-ADM 815, Section 3.C.1. Under this definition, ethereal in the kindest sense, Watson's taped-up radio counted. And, as Chief Judge McKee notes, punishment for contraband violations can include up to 90 days in restrictive confinement. If officials were allowed to hunt for every minor instance of misconduct in an effort to punish inmates for their speech, the First Amendment would ring hollow inside a prison's walls.

Though Chief Judge McKee's opinion provides needed guidance on the first question left open by *Carter* (the "quantum" of evidence that is needed), it has no occasion to reach the second (whether the same decision defense can ever fail if there is a sufficient "quantum"). For this second question to arise, the evidence of misconduct would need to be greater (a sufficient "quantum" under *Carter*) than it was here, and the proof that the official would not have taken the same action in the absence of constitutionally protected activity would need to be stronger. Take, for instance, the hypothetical at the beginning of this concurring opinion, where the guard admits that there would have been no charge without the complaint. What then?

8

This is an important question, and I hope that in future cases we will be able to provide a clear answer. As discussed, in *Carter* we held that, "[e]ven if prison officials were motivated by animus to jailhouse lawyers," the offenses "were so clear and overt that we cannot say that the disciplinary action taken against Carter was retaliatory." 292 F.3d at 159. But I do not read this to mean that all "clear and overt" violations will lead to the same result. In that case, there was no direct evidence that the officials were motivated *solely* by a desire to retaliate. Rather, the best scenario for the inmate was that the officials had mixed motivations—some legitimate and others not. This is the situation in which the same decision defense is supposed to apply. However, in cases where there is direct evidence that retaliation drove a charging decision, the defense does not shield a defendant from liability. The defense's very name belies its applicability.

To discourage overreading this concurrence, I note that I have no doubt that an official who disciplines an inmate for a "clear and overt" violation should enjoy a strong presumption that the same decision defense applies. As the Eighth Circuit has recognized, it would produce chaos if prisoners could survive summary judgment on retaliation claims in response to every routine disciplinary action. Such an outcome would be inconsistent with the Supreme Court's instruction that, in "the volatile prison environment, it is essential that . . . officials be given broad discretion to prevent . . . disorder." *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989). Thus, though a "legitimate prison disciplinary report" is not an "absolute bar to a retaliation claim," it is "probative and potent summary judgment evidence." *Woods*, 60 F.3d at 1166. But the Eighth Circuit has overcorrected for the problem. There is no reason to disregard normal First Amendment standards by closing the door entirely. The

9

power to prevent disorder is not a license to retaliate. With the right evidence, the presumption should be rebuttable.

* * * * *

In sum, today's majority opinion clarifies that not every violation of prison protocols supported by some evidence will bar a First Amendment retaliation claim. That is particularly so with relatively minor offenses, such as a radio antenna secured by tape. The standards for more serious violations will need to be decided in future cases.

*Joseph Watson v. Gerald L. Rozum, et al.*, No. 13-3510

HARDIMAN, *Circuit Judge*, dissenting.

The Court's opinion and the concurrence shed light on a lacuna in our precedent on First Amendment retaliation claims in the prison context, namely whether and how a prisoner can overcome the "same decision" defense when the adverse action complained of is a charge of prison misconduct and the prisoner concedes the facts giving rise to the charge. Unlike my colleagues, however, I do not see this appeal as the appropriate vehicle for answering that question. Under the current state of the law, courts are required to uphold government action motivated by retaliatory animus as long as the responsible government officials can show that the same action would have occurred for reasons unrelated to retaliation—a mixed-motive defense. Here, the evidence the parties have proffered on summary judgment establishes at most that a prison guard acted with mixed motive, which is not enough. Because I believe Watson's appeal flounders on that evidentiary ground, I respectfully dissent.

I

In *Rauser v. Horn*, 241 F.3d 330, 333–34 (3d Cir. 2001), we "imported" the burden-shifting scheme enunciated by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 273, 288 (1977), to adjudicate First Amendment retaliation claims brought by prisoners. Under *Mt. Healthy*, the causal relationship between protected conduct and adverse action requires a showing of but-for causation. Instead of placing the heavy burden of proving but-for causation solely on the prisoner, however, we "divided the burden of proof relating to causation between the

parties." *Green v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011). Thus, once a prisoner shows that a retaliatory motive was a "substantial or motivating factor" leading to the adverse action, the burden shifts to prison officials to show that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *See Rauser*, 241 F.3d at 334. Accordingly, *Rauser*'s same-decision defense essentially requires prison officials to *disprove* that the retaliatory motive was a but-for cause of the adverse action.[1]

The upshot of *Mt. Healthy* and *Rauser*'s emphasis on but-for causation is that a prisoner cannot negate a same-decision defense merely by pointing to the existence of retaliatory motive on the part of prison officials, *i.e.*, that the prison officials acted with mixed motives. Instead, the prisoner must counter a same-decision defense directly, that is, with evidence demonstrating that retaliation was a but-for cause. To hold otherwise would permit the prisoner to override the same-decision defense using exactly the same evidence relevant to establishing his prima facie case. This, in turn, would vitiate the inference of but-for causation that

---

[1] Some of our sister courts impose a higher burden on prisoners. *See Rauser*, 241 F.3d at 334 n.2 (citing *Goff v. Burton*, 7 F.3d 734, 737–38 (8th Cir. 1993); *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995); *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 2001)); *see also Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (requiring the prisoner to prove that the adverse action "did not reasonably advance a legitimate correctional goal").

arises when prison officials fail to prove the same-decision defense, *see Greene*, 660 F.3d at 979, and would undermine the purpose of allowing a mixed-motive defense in the first place: achieving an appropriate balance between protecting the prisoner's constitutional rights, and avoiding the "undesirable consequences not necessary to the assurance of those rights." 429 U.S. at 287.

## II

The Majority references but-for causation only in passing, and instead focuses its attention on the open question of what (if any) evidence a prisoner can offer to overcome the same-decision defense. It confronts this open question in a scenario that has received significant judicial attention but upon which we have opined only in limited fashion. Specifically, Watson has conceded the factual predicates giving rise to his misconduct— that his radio's antenna was "loose" and "wiggly" and that he had secured the antenna to the radio with tape, *see* Watson Br. 16—but nonetheless contends that he was issued a misconduct in retaliation for requesting a grievance form. Several of our sister courts would foreclose his claim merely by virtue of the fact that his misconduct is supported by "some evidence," *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994), or because "there is no dispute that [Watson] committed the most serious, if not all, of the prohibited conducted charged." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (internal quotation marks omitted). *See also O'Bryant v. Finch*, 637 F.3d 1207, 1215 (11th Cir. 2011) ("[A]n inmate cannot state a claim of retaliation for a disciplinary charge involving a prison rule infraction when the inmate was found guilty of the actual behavior underlying that charge after being afforded adequate due process."). Our only precedential foray into this area

3

acknowledges that a "clear and overt" violation of prison regulations could potentially preclude a genuine dispute of material fact on the same-decision defense. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

These decisions suggest that a certain "quantum" of misconduct evidence, *id.*, will "checkmate[]" a prisoner's retaliation claim, *Henderson*, 29 F.3d at 469, a proposition that the Court today neither accepts nor rejects. Instead, the Majority asserts that the record in this case supports opposing inferences that establish a genuine dispute of material fact on Officer Coutts's same-decision defense. Thus, the Majority contrasts this appeal with *Carter v. McGrady* by stating:

> Watson's situation is different. Watson's broken radio was not so "clear and overt" a violation that we can conclude that he would have been written up if he had not also given prison officials "a hard time." The radio had allegedly been in the same condition for more than a year. Moreover, there is evidence that other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct. Finally, [Officer] Kline did not charge Watson with a misconduct when he confiscated the radio. Accordingly, a reasonable fact finder could conclude that the misconduct was issued in retaliation for Watson's statement that he was going to file a grievance, and not in furtherance of legitimate penological goals.

Majority Op. 12–13.

4

Based on my examination of the summary judgment record, I do not agree that "Watson's situation is different." At best, his evidence reiterates that retaliation was among Coutts's motivations for issuing the misconduct, but does not demonstrate that Watson would not have received the misconduct in the absence of that retaliatory motive. In other words, Watson's evidence fails to establish a genuine dispute concerning the element of but-for causation (or lack thereof) that lies at the center of the same-decision defense. Accordingly, this appeal does not present an occasion for us to consider whether and how the same-decision defense can be overcome.

The Majority places substantial weight on statements made by Coutts to the effect that he issued the misconduct because Watson gave the guards a "hard time." This evidence comes by way of Watson's deposition testimony, and I excerpt the relevant portions of the record in the margin.[2] The

---

[2]    A.    Officer Coutts . . . was interrogating me about the radio, saying that I gave his Captains and the other Officer a hard time by wanting my radio antenna fixed, instead of just leaving it alone. Now I'm going to get a Misconduct and Mr. DuPont is going to keep my radio.

App. 62.

Q.   They're going to keep your radio? That's what [Coutts] said?

A. Right . . . So we go back and forth. So I was telling [Coutts] that the [sic] Officer Kline broke it. So I was just asking him, could he fill out an incident report, so I could have my radio antenna fixed. And then he was saying . . . that I didn't do it in a polite way and I wanted an incident report filled out. But then I asked for a Grievance, you know. And I said, yeah, well, that's the policy, you know. I need an incident report filled out so that the Officer that broke the antenna, so I can have my radio fixed. But I still have to make a Complaint.

Anyway, he said, well, go back to the Unit and they going to call you back down here to pick up your Misconduct.

App. 62–63.

Q. But you had thought that [Coutts] was calling you down to pick up your radio; right?

A. Right. But, the point is, when I got down here, he was interrogating me and he had told me, being that I gave his Captain

6

important point here is that Watson's testimony establishes at most that Coutts acted with retaliatory motive, but it hardly demonstrates that his motive was a but-for cause of the misconduct. By permitting such an inference from Coutts's admission, the Majority undoes the careful balance underlying the same-decision defense by allowing Watson to survive summary judgment simply by asserting that Coutts acted with mixed motive. Moreover, by acknowledging that other prison officials in Coutts's chain of command "would have approved the misconduct" irrespective of his request for a grievance, Majority Op. 8, the Majority's inference of but-for causation with respect to Coutts cannot be squared with its conclusions regarding causation as to the other defendants because all of them had a hand in bringing about the challenged conduct—the issuance of the misconduct.

The Majority's consideration of the remaining evidence is equally unpersuasive. First, the Majority asserts that Watson's broken radio was not a "clear and overt"

---

> and the other Officer a hard time,
> I'm going to be written-up.

App. 65.

> A. Right. [Coutts] stated, you gave my Captain and the other Officers a hard time, wanting a Grievance and an Incident Report filled out. For that, you're getting a Misconduct.

App. 90.

7

violation of prison regulations in contradistinction to *Carter*. However, under these regulations, "any item altered from its original state (state issued or personal) may be considered contraband," App. 4 (quoting DC-ADM-815 § 3.C.1), and there is no factual dispute that Watson altered his radio's antenna by securing it to the radio with tape. As such, the radio was contraband, and Watson's possession of it was unquestionably a violation. To the extent that the Majority disagrees, it is worth noting that Watson has not challenged the regulation's validity, and its application to his radio is neither irrational nor fails to serve a legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). Indeed, it is not difficult to see why a detached antenna poses a security threat in a prison.

Second, the Majority emphasizes the temporal aspects surrounding the issuance of Watson's misconduct, specifically that Officer Kline failed to issue a misconduct when he confiscated Watson's radio, and the radio had been contraband for over a year without action from prison officials. It is not clear how these considerations should cut with respect to Coutts, as opposed to Kline or the other officers. There is no suggestion that Coutts failed to act immediately when he learned of Watson's radio, or that he (or any other officer for that matter) was simply hunting for an infraction of prison rules. Thus, I do not agree that the timing of the misconduct issued against Watson supports an inference of but-for causation against Coutts.

Finally, the Majority suggests that Watson has shown discriminatory application of the contraband regulation based on evidence that similarly situated prisoners with broken radios were not issued misconducts because they did not make requests to file grievances. I agree that the disparate

8

treatment of similarly situated individuals can support an inference of but-for causation, but Watson's evidence falls far short of the mark. The evidence in question comprises declarations filed by three of Watson's fellow prisoners: Frank Trainer, Harry Montgomery, and Ronald Banks. The affidavits filed by Trainer and Montgomery are not probative in this case because they fail to identify any of the officers responsible for the averred conduct; Banks's declaration names Captains Simosko and Dupont, but says nothing about Coutts, so it too is of limited value. Banks's declaration actually cuts against Watson because it mentions an instance in which Simosko and Dupont upheld a misconduct charge involving an "altered" radio in the absence of a grievance request, *i.e.* a paradigmatic nonretaliatory application of the contraband regulation. *See* App. 127. Thus, I cannot agree with the Majority that Watson's evidence suffices to create a genuine dispute as to whether he would have received his misconduct in the absence of his request to file a grievance.

*    *    *

For the foregoing reasons, I respectfully dissent.